GEORGE & BROTHERS, L.L.P.

LAW FIRM
1100 NORWOOD TOWER
114 WEST 7TH STREET
AUSTIN, TEXAS 78701

www.GeorgeandBrothers.com

TELEPHONE: (512) 495-1400
FACSIMILE: (512) 499-0094

August 10, 2006

Amalia Rodriquez-Mendoza
Travis County District Clerk
1000 Guadalupe, Room 302
Austin, Texas 78767-1748

D-1-GN-06-002891

Re:    Cause No. _____; Mark Downie, et al v. Strasburger & Price, LLP, and Lee
Polson; _____ Judicial District; Travis County, Texas

Dear Ms. Rodriguez-Mendoza:

Enclosed please find the original and one copy of **Plaintiff's Original Class Action
Petition**. Please file this document with the records of the court and return a file-marked copy to
our courier.

A check in the amount of $278 is enclosed ($232 for filing fee, $30.00 for Jury Demand
and $16 for citation issuance fees). Please issue citations for the following defendants:

1.    **Strasburger & Price, L.L.P.** (can be served through its managing partner, Michael G.
Maloney, 600 Congress Avenue, Suite 1600, Austin, Texas 78701)

2.    **Lee Polson** (can be served at his place of business 600 Congress Avenue, Suite 1600,
Austin, Texas 78701)

If you have any questions, please do not hesitate contacting me.

Very truly yours,

Jeff S. Lutz
Legal Assistant

/jl
Enclosures



00015793.4

D-1-GN-06-002891

CAUSE NO. _____

| | | |
|---|---|---|
| MARK DOWNIE, LOREN NOWELL, RICHARD GLOVER, RALPH R. PECK, and WILLIAM KEETON BLACKBURN, Individually and on behalf of a class of all others similarly situated, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | |
| vs. | § § | TRAVIS COUNTY, TEXAS |
| STRASBURGER & PRICE LLP and LEE POLSON, Individually and in his capacity as a member, director, Partner, and/or shareholder in Strasburger & Price LLP | § § § § | |
| Defendants. | § § | 250th JUDICIAL DISTRICT |

FILED
06 AUG 10 PM 3: 11
DISTRICT CLERK
TRAVIS COUNTY, TEXAS

## PLAINTIFFS' ORIGINAL CLASS ACTION PETITION

**TO THE HONORABLE JUDGE:**

Mark Downie, Loren Nowell, Richard Glover, Ralph R. Peck, and William Keeton Blackburn, investors in CKG Energy, Inc. and CKG Pipeline, LLC, acting on behalf of themselves and all others similarly situated, file this Original Class Action Petition against Strasburger & Price LLP and Lee Polson, individually and in his capacity as a member, director, partner, and/or shareholder in Strasburger & Price LLP, for violating the Texas Securities Act by selling unregistered securities and selling securities by the use of misrepresentations, aiding and abetting in the sale of unregistered securities through misrepresentation, conspiracy to commit securities fraud, conspiracy to violate the Texas Securities Act, attorney malpractice, breach of fiduciary duty, and negligent misrepresentation. Each of the defendants did business in Texas and committed torts in Texas.

### RULE 190 DISCOVERY CONTROL PLAN

1.      Pursuant to Texas Rule of Civil Procedure 190, plaintiffs advise the Court that this case is a complex case with multiple parties in which the monetary relief sought is

substantially in excess of $50,000, and that it will require extensive expert testimony of a highly technical and specialized nature. Plaintiffs are filing a motion requesting that discovery be conducted in accordance with a Level 3 discovery control plan tailored to the circumstances of this suit, pursuant to Texas Rule of Civil Procedure 190.4.

## NATURE OF THE CASE

2.     This is yet another case in which lawyers aided their clients in defrauding hundreds of investors, causing millions of dollars of losses. This case arises out of the work Strasburger & Price LLP ("Strasburger") and Lee Polson, a partner of Strasburger, did in representing two entities, CKG Energy Inc. and CKG Pipeline LLC, (collectively "CKG"), and Michael George, the owner and president of CKG from March of 2002 until sometime in mid 2004 during which CKG took in over $11,000,000 from investors for investments in gas drilling projects. These investors were told that they were investing in specific wells CKG was drilling in New Mexico and that they could expect large returns.  Instead, their money was put into CKG's general account, without any assignment to a specific drilling project and George used that general account as his personal ATM machine, spending it, solely at his own discretion, for his living expenses and for generous gifts and support to his family and friends.

3.     From the beginning of their representation, Polson and Strasburger knew that George and CKG were selling unregistered securities, that CKG was not properly licensed as a broker/dealer under the Texas Securities Act, and that CKG's sales personnel were not properly licensed to sell securities.  They knew very early on that George was commingling investor funds in a single account and, rather than using those funds to drill the wells investors had invested in, was spending much of the money from that account as if it were his own, rather than using it for the benefit of his investors.  Polson and Strasburger knew that CKG's record keeping and

financial records were woefully inadequate. They knew that George had claimed CKG had leases it did not have and that he had claimed CKG had drilled wells it had not drilled.

4.      Strasburger and Polson, however, never instructed CKG to disclose these material facts to investors or to the State Securities Board, nor did Strasburger and Polson inform investors or the Board that their client was committing an ongoing fraud. In fact, when the State Securities Board attempted to investigate CKG's and George's activities, Polson and Strasburger delayed that investigation and presented the Board with incomplete and misleading documents. Polson never told investors that their money was being used by George to pay his house payments or medical expenses, or to pay other investors' claims against him. Polson never told the investors that George was not drilling all the wells he claimed, that he had oversold some wells, or that he did not have all the leases he claimed to have. By their actions, Polson and Strasburger made it possible for CKG and George to continue to defraud the plaintiff investors by keeping CKG and George afloat, thus knowingly lending their name to a fraud.

5.      Plaintiffs in this case seek recovery from these defendants for the losses suffered by CKG and its investors.

## PLAINTIFFS

6.      Plaintiffs are Mark Downie, Loren Nowell, Richard Glover, Ralph R. Peck, and William Keeton Blackburn, individually and on behalf of a class of all others similarly situated.

7.      Plaintiff Mark Downie is a resident of Granite Bay, California.

8.      Plaintiff Loren Nowell is a resident of Folsom, California.

9.      Plaintiff Richard Glover is a resident of High Point, North Carolina.

10.    Plaintiff Ralph R. Peck is a resident of Granite Bay, California.

11.    Plaintiff William Keeton Blackburn is a resident of Junction, Texas.

## DEFENDANTS

12.     Defendant Strasburger & Price L.L.P. is a limited liability partnership doing business in Texas. It may be served with process by serving its managing partner, Michael G. Maloney, at his place of business, 600 Congress Avenue, Suite 1600, Austin, Texas, 78701.

13.     Defendant Lee Polson is a Texas resident and may be served with process at his place of business at 600 Congress Avenue, Suite 1600, Austin, Texas 78701.

## VENUE AND JURISDICTION

14.     Venue is proper in Travis County, Texas pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(1), (2), and (3) because this action arises out of or is connected with business conducted by CKG and George in Austin, Travis County, Texas so that all or a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in Travis County, Texas, Strasburger & Price LLP is a law firm with a principal office in Travis County, and Lee Polson resides in Travis County. The Court has jurisdiction over the parties and causes of action because plaintiffs' damages are in excess of the jurisdictional minimum of this Court.

## CLASS ALLEGATIONS

15.     The representations, misrepresentations, acts and omissions alleged by the class plaintiffs against the defendants in this case are a proximate cause of the insolvency of CKG and its resulting inability to repay plaintiff investors the money they invested or any return on those investments. But for defendants assisting CKG and George and vouching for CKG's legality and legitimacy, plaintiff class members would not have invested money in CKG. A class is the necessary and appropriate procedural tool of resolving their claims; he supports their application for certification.

16.     The individually named plaintiffs all invested money in CKG's drilling projects

and are proper representatives of the class consisting of all persons who invested money in CKG because:

      i.    there are so many investors that joinder of all class members is impracticable;

      ii.    there are questions of law and/or fact common to the class;

      iii.    the claims of the named Plaintiffs and any defenses to those claims are typical of the claims of and defenses to the members of the class; and

      iv.    the individual representatives will fairly and adequately protect the interest of the class.

17.    In addition, prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the defendants. Adjudication with respect to individual class members would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication. Questions of law and/or fact common to the members of the class predominate over any questions affecting only individual members.

18.    The misrepresentations were made primarily in writing, using form documents, and the material omissions were the same in every case—that George had been the subject of numerous cease and desist orders by other states for his activities involving the sale of fraudulent securities, that he was pooling investors' money, that he was not drilling the wells he claimed to be drilling and did not have the leases he claimed to have, that he was living off large portions of the investors' funds rather than using those funds to develop projects from which the investors could expect returns and that he was using, or offering to use, funds invested by new investors to pay off earlier investors. Therefore, a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FACTS

19.     Michael George was a promoter.  He talked people into investing in joint ventures—oil and gas drilling projects—that he claimed were sure moneymakers.  Then he lived off the invested money, maybe drilled a dry hole or two, and moved on to another bright prospect that he could sell to new investors.  George paid off disgruntled investors who threatened him with lawsuits with new investor money or switched their investments to other ever more promising projects.  In other words, George ran an oil-and-gas Ponzi scheme.  He was, as one bankruptcy judge said, "the proverbial hog feeding at the trough of investors' money without any real regard for the investors' rights . . . the ultimate smooth talker."  A true and correct copy of the August 16, 2005 Memorandum Opinion of Judge Frank R. Monroe, United States Bankruptcy Judge, in Case No. 04-11631-FM, Adversary No. 05-1006-FM reflecting the court's determination of George's character and business practices is attached to this Petition as Exhibit 1.

20.     George may have been interested in oil and gas properties, but his real business was raising money.

21.     Though George's joint ventures were securities, he never registered them in any state as securities.  George had been the subject of several orders by various state courts that he stop selling securities.  In 1990, he was ordered by Wisconsin to stop selling securities in that state.  In January of 1991, both the Pennsylvania Securities Commission and the Montana Securities Department issued Permanent Cease and Desist Orders against George ordering him to stop selling securities in Pennsylvania and Montana.  The Pennsylvania Securities Commission issued a second Cease and Desist Order against George in January 1998.

22.     A Texas court issued a judgment for $1,500,000 against George in 1999, finding

that he and one of his companies, Trump Energy, Inc. ("Trump"), had been selling unregistered oil and gas securities through fraud. On information and belief, Lee Polson, then with another firm, represented George and Trump in the Jackson County case.

23.   When the Texas State Securities Board, in March of 2002, notified George and CKG that it was investigating a CKG joint venture called Powder River Basin #3 as a potentially fraudulent sale of unregistered securities, George called his former attorney, Polson, now a partner at Strasburger.

24.   Polson began representing CKG and George in the State Securities Board investigation in March of 2002 but his representation quickly broadened. CKG and George sent Polson copies of angry letters from CKG investors in Powder River and from investors in other George entity "projects." Polson instructed George and CKG on how to respond to these angry letters. He reviewed and edited CKG documents. He orchestrated George's and CKG's responses to the State Securities Board and tried to craft solutions to the problem that he and Strasburger readily identified—George's joint ventures were investment contracts and, thus, securities that should have been registered (but were not), and these unregistered securities were being sold by unlicensed agents of CKG. Polson and Strasburger knew that their clients, CKG and George, were violating the Texas Securities Act.

25.   Polson and Strasburger set up a corporation, MDG Funding, Inc., that was intended to serve as the licensed broker for CKG's joint ventures so that the investments could be registered as securities. MDG also was intended to serve as the employer of licensed sales agents. Strasburger attorneys instructed CKG's sales personnel about taking the state licensing tests so that they could sell CKG's joint ventures legally. But Polson and Strasburger knew that CKG's agents, none of whom ever actually became employees of MDG, were not getting

licensed and Polson and Strasburger knew that the agents were still selling CKG's unregistered joint ventures. MDG was just a sham to convince the State Securities Board that CKG was trying to bring its business into compliance with Texas's securities laws.

26.     In fact, Polson and Strasburger knew very early in their representation that CKG and George could not comply with Texas securities laws. Polson knew, for example, that George was pooling all the investor funds into a single account and was not segregating investors' money into the individual joint venture accounts or assigning their money to be used in the specific well that the investors were—or thought they were—investing in. He knew that George made all the decisions about where, when, how, and whether to drill for natural gas on leases that CKG owned or claimed to own, without getting or asking for any significant input from the investors. He knew that George was using the investors' money to pay his lavish salary, all his living expenses, including child support, house payments, property taxes, medical expenses, and non-business travel. Polson knew that George improperly used money invested in specific joint ventures to pay CKG's commissions and general expenses that were not connected in any way to those specific joint ventures and that George and CKG were not keeping adequate records of expenses so that creating any meaningful accounting for these joint ventures was impossible. In other words, Polson knew that investors could never find out if their joint venture made money or lost money, no matter whether any CKG well produced gas.

27.     Polson knew that George, CKG, and the sales agents were not telling the investors these material facts about their investments—that they were, in fact, selling CKG securities through the use of misrepresentations and omissions of material fact that constituted fraud. And—perhaps most important—Polson and Strasburger knew that George, CKG, and its agents continued to sell these investments fraudulently even while Polson and Strasburger were

representing them in their dealings with the State Securities Board and with the investors themselves.

28.     Because of their knowledge, Polson and Strasburger had a choice to make with regard to representing CKG and George:  they could demand that CKG and George tell the investors the truth about their investments or Polson and Strasburger would resign; they could simply resign from the representation; or they could disclose the truth to their clients' investors themselves.  Polson and Strasburger did none of these things.  Instead, Polson and Strasburger set about delaying the State Securities Board investigation and helping CKG and George continue their fraudulent operation.

29.     By April 5, 2002, Strasburger was asking for an extension of time to reply to the Securities Board letter.  When Stasburger and Polson did respond, they did not provide all the agreements that CKG claimed to have with its vendors because, according to Polson, most of those agreements were oral.  Strasburger and Polson were not able to provide accounting records for the three wells in the Powder River #3 investment because CKG did not keep separate records of expenditures for the three individual wells. (In fact, as Polson knew, CKG did not keep separate records of expenditures, not just for the wells, but even for the joint ventures.) They offered the State Securities Board, instead, CKG's bookkeeper's notes of the expenses of the three wells "based on the checking account records" and CKG's operating account.  In other words, the only financial records that CKG had for the millions of dollars it was taking in from investors was the bank statement for one account, with a bookkeeper's handwritten notes, out of which George drew money to spend on himself and his family.  George treated his investors' money as if it were his own.

30.     At the same time that he was producing these woefully inadequate accounting

records to the Texas State Securities Board, Polson was receiving copies of the Pennsylvania Cease and Desist Order against CKG, George, and Powder River for selling or attempting to sell this unregistered security to a Pennsylvania resident in violation of a previous injunction that Pennsylvania had issued against him in 1998 and a writ of execution on the earlier Texas judgment against George for approximately $2,000,000 in damages for securities fraud. Polson and Strasburger knew what their client George had done before and they knew that their clients, George and his new company, CKG, were doing it again. But they did not tell the State Securities Board or the investors, and they did not resign.

31.    Throughout Polson's representation of George and CKG, Polson knew that CKG had no real source of income other than the money investors were putting into the joint ventures. Polson knew that CKG agents and George were continuing to sell joint ventures in various gas projects. Yet as a way of placating angry earlier investors and the State Securities Board that was beginning to hear from these investors, Polson and Strasburger advised George to offer to transfer people out of the Powder River Basin projects into new projects in New Mexico—again promising quick returns and large profits. In the letters to investors that Polson drafted and/or approved, CKG offered to transfer people to a project in Guadalupe County, New Mexico where CKG claimed to hold a lease and to own 100% of the working interests of 2 gas wells already drilled and "field tested" at 2.3 million and 2.7 million cubic feet per day and "ready to put on line." Exhibits 2 and 3. In fact, CKG did not have a lease in Guadalupe County when the letter was sent out; it did not ever have such a lease. If Polson, at this late date and with full knowledge of George's past misdeeds, simply took his client's word that CKG held the lease and had 100% of the working interests in 2 wells that had been field tested with these results without checking the information, Polson was acting with at least reckless disregard for the truth of the

statements being sent to investors.  If Polson knew that CKG did not have the lease it was claiming to have (even though it was trying to get just such a lease), he was committing fraud and allowing his client to commit fraud.

32.     A later letter to Powder River investors, dated June 19, 2002, urged them to transfer their interests to CKG projects called Latigo #1 and Latigo #2 without mentioning the Guadalupe County lease but this letter again claimed that there were two wells on CKG's lease that field tested at the same pressure as the earlier letters had claimed.  Exhibit 4.  In fact, the Latigo wells never were properly field tested, never registered this volume of gas, and never produced marketable amounts of gas.

33.     The offering memoranda for Latigo #1 and Latigo #2 given to investors and potential investors, however, talked about CKG's fictitious lease in Guadalupe County, New Mexico. Polson had copies of these offering memoranda in his files at Strasburger.  He knew, or should have known, that CKG had no lease on land in Guadalupe County—and never obtained such a lease.  Eventually CKG did lease property in Quay County, New Mexico.  CKG then called the wells drilled on that Quay County lease the Latigo projects, without ever telling its investors about the switch. But the geologic information in the offering memos, the maps and property descriptions, the claims about wells and field tests, availability of pipelines to transport gas to processing plants and markets, and all the rosy prospects of success in those memos were simply lies.  Some of that information in the offering memos may have been correct for some other lease in Guadalupe County that CKG did not have.  None of it was correct for a smaller lease in Quay County.  Investors were being misled, lied to, and cheated by CKG's investment memoranda.  Polson had those memoranda, knew that they were being sent to potential investors and either approved the lies and fraud or did nothing to check their accuracy, even though he

knew his clients were being investigated for securities fraud.

34.     Within two months of sending out letters offering to switch Powder River investors to the Latigo projects to keep them from venting their anger before the State Securities Board, Polson also began to try to settle the approximately $2,000,000 in damages from the *Trump* lawsuit against George and one of his companies for securities fraud.  Polson persuaded George to agree to offer to pay a portion of that judgment, even while knowing that George had no source of money to settle this lawsuit except from the funds invested by new investors.  CKG had no income except from investors and Polson knew that.  George's affidavit executed as part of the settlement negotiations pursued by Polson even stated that George had "no revenue from any source except" CKG.

35.     By October of 2002, Polson was providing the State Securities Board with a list of investors "updated to reflect the investments since [April]."  Polson now had been representing CKG for eight months during which he knew that CKG had continued to take in investor funds and George had continued to live off those funds.

36.     All the while, CKG's office manager continued to fax Polson angry investor letters which she asked Polson to handle, while simultaneously sending Polson updated investor lists showing that investors were continuing to entrust their money to CKG throughout 2002 and well into the fall of 2003.

37.     Polson continued to delay the State Securities Board investigation by requests for postponements and production of incomplete documents.  By December of 2002, Polson was going over CKG's checks, explaining that checks to George were "advances" on his salary and that CKG was "still working on a full accounting for the funds" spent on Powder River and other projects.

38.     By May of 2003, over a year after Polson began to represent CKG and George, Polson—in another effort to placate the State Securities Board—arranged for his client to make an offer of rescission to investors in Latigo #1 and #2 for the amount of their original investment plus 10% interest.  Polson drafted the letter that went out to investors.  He explained that the offer was being made because "the Latigo offerings last year may not have complied with all registration and disclosure aspects of state securities laws."  Exhibit 5.  The letter then explains, in part, some of the ways in which the Latigo sales had, in fact, violated the Texas Securities Act:

    a.   The investments were not registered as securities;

    b.   CKG was not a registered dealer in securities;

    c.   its agents were not licensed to sell securities;

    d.   its agents were paid commissions for selling CKG's securities, which violated the Act;

    e.   CKG's offering memos claimed that CKG held leases it did not have; and

    f.   CKG's offering memos contained geologic descriptions, wells and test results for those wells, assurances about access to pipelines, and market projections that were not accurate because they all referred to property on which CKG had no lease.

39.     Polson had had access to all this information about the Latigo offering memoranda for months.  He did not disclose it to investors until after he had represented CKG and George for over a year.  Either he had chosen not to confirm the truth of the statements he knew his clients and their agents were making to potential investors—all the while knowing that his clients had previously been involved in securities fraud in Texas and in other states—or he knew the statements were incorrect and allowed his client to make them anyway.  Either way, Polson and Strasburger were aiding and abetting securities fraud, conspiring to aid and abet

securities fraud, and aiding and conspiring to aid CKG in violating its fiduciary duties to its own investors. And either way, Polson's and Strasburger's actions caused harm to the investors.

40.     Polson's and Strasburger's "revelations" in the offer of rescission, however, failed to reveal a material fact: Polson's letter may have offered the investors a refund of their investment plus 10% interest on that investment, but it did not tell the investors what Polson knew from CKG's financial statements—that CKG and George could not pay these investors what they were promising. And even more important, again, Polson was arranging that George and CKG pay earlier investors (as much as it was possible at that point for CKG to pay them back) with new investor money that George and CKG were still bringing in.

41.     The earlier settlement offer and this rescission offer, because it necessarily involved the use of new investor money to pay earlier investors, constituted a Ponzi scheme. Polson did not tell the investors that their money was being used improperly in this way. Polson did not tell the State Securities Board that his client was intending to pay off old investors with new investor money. Polson did not advise his clients that to pursue this course of action was fraudulent and a violation of the Texas Securities Act. Polson and Strasburger advised their clients to make these offers and drafted the documents necessary to accomplish them. Polson and Strasburger, thus, were independently engaging in fraud, securities fraud as well as aiding in securities fraud, conspiracy to commit securities fraud, breach of CKG's fiduciary duties to its investors, and conspiracy to breach that fiduciary duty as well as committing malpractice with regard to their client CKG when they advised their clients to make these offers and drafted the documents for them.

42.     Polson's drafting of the rescission offer sent out to investors in Latigo #1 and #2 went beyond merely condoning the fraudulent misrepresentations of his clients or merely failing

to confirm that his clients were telling investors the truth.  Polson drafted this letter telling the most effective of lies—he told a part of the truth but neglected to tell the rest of the truth.  He told the investors that CKG's offering memoranda had not been accurate.  He did not tell the investors that their money was gone—that much of it had been spent by George on himself and his family and his fancy boats and jet skis and million-dollar home and that the rest had been spread among all the "projects" that George took a fancy to, without any attempt at real accounting and without any concern for the fiduciary duty that George and CKG owed to their investors.

43.     Polson's and Strasburger's acts allowed CKG and George to continue defrauding investors.  Polson and Strasburger kept CKG and George afloat while knowing that CKG and George were continuing to violate the Texas Securities Act and securities regulations and orders from other states by selling unregistered securities through the efforts of unlicensed agents by the use of misrepresentations and omissions of material fact.  Their acts were the producing cause of actual damages suffered by CKG's investors.  They are, thus liable to the investors who suffered as a result of their actions.

## CAUSES OF ACTION

### Count I

### Violations of the Texas Securities Act and Securities Fraud

**A.     Strasburger and Polson Are Liable As Sellers of Unregistered Securities Under the Texas Securities Act**

44.     Under the Texas Securities Act, Tex. Rev. Civ. Stat. Art. 581-4.A, an "investment contract" is a security.  An investment contract exists if the following factors are present:

    a.  an investment of money,

    b.  in a common enterprise,

      c.  with the expectation of profits, and

      d.  profits are realized solely from the efforts of others.

CKG's joint ventures fit all these characteristics.

    45.    Under Texas law, an enterprise is common if there is "vertical commonality." Vertical commonality exists when one or more investors join with a promoter to accomplish a common purpose, and the investors' success is determined by or dependant upon the promoter's success or ability. As Strasburger and Polson clearly knew, the class of plaintiff investors placed their money in the hands of George and CKG in order to profit from CKG's drilling of gas wells and its construction of pipelines so that any gas produced by CKG's wells could be marketed. Strasburger and Polson also knew that the fortunes of the class of plaintiff investors depended solely and completely on the efforts and success of CKG and that the plaintiff investors invested their money with the explicit understanding that CKG had leases on which one or more wells already existed and would make the day-to-day decisions required for drilling of new gas wells and construction of a pipeline.

    46.    Section 7.A(1) of the Texas Securities Act prohibits the sale or offer for sale of unregistered securities by any "dealer, agent or salesman." George and CKG did not register their investment contracts as securities and Strasburger and Polson knew that from the beginning of their representation. Though attorneys at Strasburger told CKG that its agents must be registered in order to sell securities, Polson knew that CKG was continuing to take in investment money and that the CKG sales force was not taking steps to become registered sellers of securities.

    47.    There is no record that Polson and Strasburger ever told George or CKG that they would resign from their representation unless CKG became a properly registered broker or

dealer. There is no record that Polson and Strasburger ever told George or CKG that they would resign if George and CKG continued to sell gas joint ventures without complying with the Texas Securities Act. Polson and Strasburger did not tell their clients that they would stop representing George and CKG if they continued to take in investor money in violation of the Texas Securities Act or if they continued to use unlicensed agents to solicit investments. There are no written instructions to George that he stop taking investor money into CKG. There are no written instructions that George stop treating CKG's business account as his own personal ATM machine.

48.     Polson contacted investors at various times in his representation of CKG but he never mentioned that the money they had put into CKG's joint venture projects was being used to pay George's house payments, taxes, medical bills, and non-business travel. Polson drafted a rescission offer for CKG to send out to investors who were complaining about being transferred from a CKG drilling project in Wyoming (that Wyoming shut down because of securities fraud) to a CKG drilling project in New Mexico where CKG did not even have a lease to drill, but he did not mention what he knew to be a fact—the only money to pay these earlier investors was the money that CKG was getting from new investors.

49.     Tex. Rev. Civ. Stat. Art. 581-33A(1) establishes liability for "a person who offers or sells" an unregistered security. Under Texas law, a person offers or sells securities if he or she is any link in the chain of the selling process. Tex. Rev. Civ. Stat. Art. 581-33A(1) establishes liability for "a person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact" if that person "was any link in the chain of the selling process." *Lutheran Brotherhood v. Kidder Peabody & Co.,* 829 S.W.2d 300, 306 (Tex. App.—Texarkana 1992, *writ granted, judgm't vacated w.r.m.* 840 S.W.2d 384 (Tex. 1992)

citing *Brown v. Cole*, 291 S.W.2d 704 (1956). But for Polson's and Strasburger's efforts to defend CKG in the State Securities Board investigation and to placate earlier investors, CKG could not have continued to keep the money flowing from new investors into CKG's account and out again in payments to earlier investors and into George's own pockets. Polson and Strasburger expected to be paid—and they were paid—attorneys' fees for their efforts. These defendants, thus, were "links in the chain of the selling process" for CKG's unregistered securities. They are, therefore, liable under Tex. Rev. Civ. Stat. Art. 581-33A.

50.     As sellers of securities within the meaning of the Texas Securities Act, Polson and Strasburger are liable for all misrepresentations, commissions, and acts of securities fraud committed by George, CKG, and CKG's agents in the chain of sale. Strasburger and Polson are liable for these misrepresentations, even if they did not know the misrepresentations or omissions were being made.

51.     Sections 4.F and 32 of the Securities Act provide sanctions for the use of fraud and fraudulent practices in connection with the offer for sale of securities. Section 4.F of the Securities Act defines fraud as follows:

> The terms "fraud" or "fraudulent practice" shall include any misrepresentations, in any manner, of any relevant fact; any promise or representation or prediction as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; . . . provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

52.     Polson's and Strasburger's material misrepresentations or intentional failures to disclose a material fact to investors include, but are not limited to:

    a.  failing to disclose that George had been the subject of several Cease and Desist or Prohibition Orders from other states based upon findings that he and his business entities had engaged in securities fraud;

    b.  failing to disclose that George and one of his earlier business entities had been

found by a Texas court to have committed fraud in sale of oil and gas securities;

   c.  failing to disclose that all investors' funds were pooled into a single account with other investors' funds from other projects;

   d.  failing to disclose that investors' funds were being used by George, solely at his own discretion, for his personal living expenses and gifts and support to his family members;

   e.  failing to disclose that CKG was not keeping reasonable records of the investors' investments nor of the projects into which their funds were supposed to be directed;

   f.  failing to disclose that investor funds were not being accounted for by separate project or used for the specific project that the investor had actually invested in;

   g.  failing to disclose that CKG had claimed to have leases that it did not have;

   h.  failing to disclose that CKG was using new investor funds to pay off earlier investors and to settle a previous lawsuit judgment;

   i.  failing to disclose that some investors who threatened lawsuits arbitrarily received more than their investments back solely at George's discretion while other investors who had been promised full rescission did not receive their investments back or received only partial payment—again solely at George's discretion;

   j.  failing to disclose that profits/losses were not allocated on a pro rata basis, but arbitrarily by George in his sole discretion;

   k.  failing to disclose that CKG could not provide accurate and complete financial statements of its investor funds or its expenses and/or making affirmative misrepresentations about the state of CKG's financial records.

53.     From March of 2002 until sometime in mid 2004 when Strasburger and Polson formally ended their representation, they aided George and CKG in offering investment contracts in the form of joint ventures for the drilling of gas wells by activities or omissions including, but not limited to, the following:

   a.  failing to advise George and CKG that they must comply with the registration requirements of the Texas Securities Act;

b.  setting up a sham company, MDG Funding, Inc., to serve as a licensed broker/dealer to sell CKG securities and sending out a letter instructing CKG sales personnel to take a test to become licensed to placate the Texas State Securities Board, even while allowing George and CKG to keep selling joint venture investments without proper registration or without the use of licensed agents;

c.  failing to ensure that CKG agents were, in fact, in the process of becoming licensed or threatening to resign if they did not become so;

d.  failing to ensure that CKG stopped selling unregistered securities through the use of unlicensed agents;

e.  conducting settlement negotiations of a judgment for securities fraud when the only source of payment for that settlement would be the money invested by more recent investors;

f.  proposing, drafting, and approving an offer of rescission to investors who purchased working interests in Latigo #1 and Latigo #2 because those investments "may not have complied with all registration and disclosure aspects of state securities laws" when Polson and Strasburger knew that the only source of payment for these investors was from funds invested by more recent investors in CKG;

g.  failing to ensure that angry investors were not being paid off using new investor funds;

h.  failing to ensure the accuracy of CKG's statements to potential and actual investors about the success of the gas wells that CKG claimed to own;

i.  failing to instruct CKG and George that the disclosure that George "had securities problems in the past" was not an adequate disclosure to investors and potential investors because it omitted the material fact that the "securities problems" actually involved decisions by state securities agencies and a Texas court that George had defrauded investors and had committed securities fraud;

j.  failing to ensure that CKG's statements to potential and actual investors about the probable success of the gas wells that CKG claimed it was in the process of drilling were accurate;

k.  failing to ensure that CKG's statements to potential and actual investors about the status of construction of the pipeline to transport gas produced by CKG's wells to a processing plant and eventually to market were accurate;

l.  failing to ensure that CKG's statements to potential and actual investors about

the dates of completion of the pipeline and of the wells CKG claimed to be drilling were accurate or that investors were timely and accurately informed about any reasons for delay in those completion dates;

m.  failing to ensure that CKG's statements to potential and actual investors about whether CKG held certain leases and whether CKG was, in fact, drilling all the wells that it claimed to be drilling were accurate when made or were corrected in the materials used in making sales;

n.  failing to ensure that CKG's accounting system properly segregated investor funds by drilling project and well;

o.  failing to ensure that CKG properly assigned joint venture ownership interests to investors in the wells that those investors had actually invested in;

p.  failing to ensure that CKG was keeping accurate financial records so that its expenditures could be accounted for;

q.  failing to ensure that George did not use the CKG corporate account arbitrarily for his own personal expenses; and

r.  failing to ensure that refunds or rescissions to investors were not made purely based upon George's arbitrary decision.

54.  Investors reasonably relied on these misrepresentations and omissions of material fact by Polson and Strasburger.  These misrepresentations and omissions were the proximate cause of actual damages to the plaintiff investors.

55.  As a result of their reliance on the misrepresentations and omissions of Polson and Strasburger, the plaintiffs suffered foreseeable consequential damages including, but not limited to, lost principal and lost interest or other income.

**Count II**

**Aiding in the Sale of Unregistered Securities**

56.  Polson and Strasburger aided George and CKG in the sale of securities by means of the misrepresentations and omissions as set forth above in Count I and are thus liable under Tex. Rev. Civ. Stat. Art. 581-33A(2) and under Tex. Rev. Civ. Stat. Art. 581-33F(2) as aiders in

the sale of securities.

57.　　Tex. Rev. Civ. Stat. 581-33F(2) states as follows:

> (2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

58.　　Polson and Strasburger drafted, reviewed, and corrected documents sent to investors without telling the investors that several other state agencies had determined that George and his business entities had committed securities fraud or that there was an ongoing inquiry by the Texas State Securities Board about whether CKG's joint venture projects constituted unregistered securities and whether George and CKG were, in fact, committing securities and common law fraud.　Polson and Strasburger set up and incorporated MDG Funding, Inc. for CKG purportedly to act as the registered entity under which CKG's sellers of securities would be licensed to placate the State Securities Board and to keep it from acting quickly to close CKG's operations, even while knowing that the sales personnel who were soliciting investors for CKG's joint ventures were not taking steps to become licensed.

59.　　Polson and Strasburger continued to represent George and CKG in the State Securities Board investigation while knowing that CKG was continuing to sell unregistered securities through the efforts of unlicensed agents and was continuing to put those newly invested funds into a single account where they were commingled with investor funds from other projects.　In the course of that representation, Polson and Strasburger arranged for CKG to refund (through an offer of rescission drafted by Polson) money to earlier investors from CKG's only account.　Polson and Strasburger, thus, had to know that they were arranging for their client—as another way to placate the State Securities Board—to use money received from new

investors to pay off earlier investors in an effort to keep the State Securities Board from acting to force CKG to close and to keep earlier investors from filing suit.

60.     Polson and Strasburger, by these actions and others, materially aided George and CKG in the sale of securities by use of misrepresentations and omissions.  Polson and Strasburger are, therefore, jointly and severally liable with George and CKG for the sale of securities by use of misrepresentations and omissions of material facts.

### Count III

### Aiding a Breach of Fiduciary Duties

61.     George and CKG had a fiduciary relationship with the investors who purchased interests in CKG's joint ventures.  George and CKG acted as agents on their investors' behalf to use their money properly in the business of drilling gas wells and marketing the gas—if any—those wells produced.  The investors were justified in relying upon George and CKG to act in their best interests as their fiduciaries.  The investors were damaged by their reliance on this fiduciary relationship.

62.     Polson and Strasburger knew that George and CKG had a fiduciary relationship with their investors.  Polson and Strasburger knew, even while they represented George and CKG, that George and CKG were continuing to sell unregistered securities through the efforts of unlicensed sales people and were continuing to treat investor funds as George's personal account—all violations of George's and CKG's fiduciary duties to their investors.

63.     Polson and Strasburger were involved in reviewing investor complaints and CKG's responses to those complaints.  None of the responses that Polson and Strasburger drafted and/or reviewed and approved for sending to investors made disclosures of the material facts that Polson and Strasburger knew about the ongoing fraud and securities violations that George and

CKG were engaged in. Polson and Strasburger knew that the letters they drafted and/or reviewed were going to investors and that investors would make decisions based upon those letters about whether to remain in the investments or to commit even more funds to CKG's joint ventures. Polson and Strasburger knew, as well, that investors were sharing their information with other investors and potential investors and that the letters and responses that Polson and Strasburger were drafting and/or reviewing would thus be shared with other potential investors.

64.     Polson and Strasburger took steps that aided George and CKG in breaching their fiduciary duties to their investors by drafting documents going out to investors and potential investors that failed to inform them that George and CKG were selling unregistered securities in violation of Texas law, that George and CKG were pooling investor funds and that George was using those funds for his own personal benefit rather than for the purpose for which they had been entrusted to CKG, that other states had found George and his business entities had engaged in securities fraud and had violated securities regulations, that a Texas court had found George and one of his business entities were liable for securities fraud, and that George and CKG were paying off (or offering to pay off) earlier investors with more recent investor funds.

65.     These representations and omissions were intentional because they were made with knowledge of their falsity or made recklessly without any knowledge of the truth and for the purpose of causing injury to the investors. These misrepresentations and omissions, thus, constitute conduct for which punitive damages are recoverable.

66.     These misrepresentations and omissions were a proximate cause of actual damages suffered by the plaintiffs as well as significant expenses, including attorneys' fees and other damages suffered by the plaintiffs as a result of the acts of Polson and Strasburger in aiding George and CKG to breach their fiduciary duties to the plaintiff investors.

## Count IV

## Conspiracy to Breach Fiduciary Duties and Commit Securities Fraud

67.     Polson and Strasburger conspired with George and CKG in an ongoing violation of the securities laws of the State of Texas and in the ongoing breach of their fiduciary duties to investors in CKG's unregistered securities.

68.     Polson and Strasburger joined the conspiracy with George and CKG by participating in soliciting investor funds as enumerated above through material misrepresentations and omissions such as:

   a.  failing to disclose that George was selling unregistered securities through the efforts of unlicensed sales personnel when Polson and Strasburger knew that was the case;

   b.  failing to disclose that George was continuing to take in investor funds without taking steps to comply with the requirements of the Texas State Securities Act even while being investigated by the State Securities Board for violating the Act;

   c.  failing to disclose that George was pooling investor funds into a single CKG account and using those funds for his own private benefit rather than for business purposes;

   d.  failing to disclose that the offer of rescission that Polson and Strasburger advised George and CKG to make to previous investors would be paid with newer investor funds so as to constitute an illegal Ponzi scheme.

By these acts, Polson and Strasburger conspired with George and CKG to breach fiduciary duties to the investors and conspired with George and CKG to commit securities fraud.

69.     Polson and Strasburger also joined in the conspiracy with George and CKG to keep the State Securities Board from closing CKG down.  Polson and Stasburger represented to the State Securities Board that CKG was making a real offer of rescission to earlier investors but failed to disclose to the Board that any payment under that offer of rescission would come from more recent investor funds, because CKG had no other source of funds other than the money it

continued to take in from investors. Meanwhile, Polson and Strasburger continued to orchestrate George's and CKG's responses to irate investors to keep them from blowing the whistle on George and CKG.

70.     As a consequence of their joining this conspiracy, Polson and Strasburger are liable for the actions of George and CKG that predate their joining the conspiracy and even for those actions of George and CKG that Polson and Strasburger were not aware of, provided those actions were taken in furtherance of the purpose of the conspiracy.

71.     Polson and Strasburger are jointly and severally liable for all damages and injuries that resulted from their conspiracy with George and CKG to violate the Texas Securities Act by selling unregistered securities, aiding in the breach of selling unregistered securities, and breaching fiduciary duties. This conspiracy was a proximate cause of damages, including punitive damages, to the investor plaintiffs, including attorneys' fees and expenses.

## Count V

## Conspiracy to Commit Fraud

72.     Polson and Strasburger entered into an agreement with CKG and George to defraud CKG's investors. George, with Polson's acquiescence and active assistance, continued to make false and deceptive statements and to omit material facts when dealing with investors, now plaintiffs in this suit, with the intention of deceiving them. The plaintiffs relied upon these statements and material omissions to their detriment. The deceptive statements and omissions to the plaintiff investors were all the same or of the same character.

73.     Polson's and Strasburger's participation in this conspiracy to defraud the plaintiff investors was the proximate cause of damages to each plaintiff and Polson and Strasburger are jointly and severally liable for all the damages suffered by all the plaintiff investors that were

proximately caused by George's schemes and misrepresentations, without regard to whether Polson and Strasburger participated in all aspects of the conspiracy with regard to every plaintiff in the class.

### Count VI

### Breach of Lawyers' Duty to Non-Clients

74.     Polson and Strasburger violated the obligations of an attorney to persons who are not the attorney's clients by violating the obligation set out in RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 as adopted by *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999) (citing with approval what has now been adopted as § 51 of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS but when *McCamish* was decided was § 73 of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (Tentative Draft No. 8).  These violations of Polson's and Strasburger's obligations to the non-client investors were the proximate cause of damages to each member of the plaintiff investor class.

### Count VII

### Punitive Damages

75.     Polson and Strasburger knew that George and CKG were misleading their investors about the profitability of the joint ventures, about the nature of the leases CKG held and the number of wells that CKG had or was in the process of drilling, about how CKG was using and accounting for investor funds, and about the status of CKG's drilling and pipeline projects.  Polson and Strasburger knew that George and CKG were misleading their investors about whether the joint ventures that CKG was marketing had to be registered as securities and whether the sales personnel had to be licensed in order to comply with state securities laws and

regulations.

76.     Polson and Strasburger knew that when they proposed and drafted the rescission offer that CKG sent out to some investors, they were urging and assisting CKG to perpetrate a Ponzi scheme in which CKG would take recent investor funds to pay off, either in whole or in part, earlier investors.

77.     Despite their knowledge that these activities of George and CKG constituted securities and common law fraud, they assisted George and CKG in the commissions of these acts and continued to represent their client CKG while knowing that George and CKG were committing fraud and securities fraud.

78.     Polson's and Strasburger's actions, when viewed both from an objective and subjective point of view, demonstrate that they acted with intent to injure the plaintiff investors or that they acted with conscious indifference to the injury that would befall the investors.

79.     The acts of these defendants justify an award of punitive damages.

## Count VIII

### Attorney's Fees

80.     Plaintiffs may recover attorneys' fees and costs under Tex. Rev. Civ. Stat. Art. 581-33D(6), and (7) for claims asserted under the Texas Securities Act for the sale of unregistered securities and for aiding in the sale of unregistered securities.

81.     The plaintiff investors have retained the law firm of George and Brothers, L.L.P. to represent them in this cause of action and have agreed to pay reasonable and necessary attorneys' fees.

82.     The plaintiff investors seek their reasonable and necessary attorneys' fees, costs, and expenses resulting from this lawsuit, the filing of which was necessitated by violations of the

Texas Securities Act by Polson and Strasburger, by the defendants' aiding in the violation of the

Texas Securities Act, by the defendants' aiding in and conspiracy to breach fiduciary duties,

defendants' negligent representation and negligent misrepresentation, and other acts as

enumerated above.

83.     All conditions precedent to filing this petition have been met.  Plaintiffs plead the

discovery rule and fraudulent concealment.

## PRAYER

WHEREFORE, the plaintiffs request that Lee Polson and Strasburger & Price L.L.P. be

cited to appear and answer, and that on final hearing, plaintiffs have judgment as follows:

a.    Against Polson and Strasburger for general and special damages in an amount in
excess of the jurisdictional limits of this Court for violation of the Texas
Securities Act and for aiding violations of the Texas Securities Act:

b.    Against Polson and Strasburger for general and special damages in an amount in
excess of the jurisdictional limits of this Court for aiding in breaches of fiduciary
duty to the plaintiffs and conspiracy to breach fiduciary duties to the plaintiffs;

c.    Against Polson and Strasburger for general and special damages in an amount in
excess of the jurisdictional limits of this Court for negligent misrepresentation;

d.    Imposition of a constructive trust for the benefit of the plaintiffs on all income and
property received by Polson and Strasburger as a result of their tortuous conduct;

e.    Against Polson and Strasburger for general and special damages for their tortious
acts;

f.    Reasonable and necessary attorneys fees, costs, and expenses of suit;

g.    Prejudgment and post judgment interest to the maximum extent allowed by law;
and

h.    All other relief, at law and in equity, to which the plaintiffs may be justly entitled.

Respectfully submitted,

GEORGE & BROTHERS, L.L.P.
R. James George, Jr.

Gary Lewis
Nanneska Hazel
1100 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
(512) 495-1400; FAX (512) 499-0094

By: _____
    R. James George, Jr.
    State Bar No. 07810000
    Gary L. Lewis
    State Bar No. 12277490
    Nanneska N. Hazel
    State Bar No. 12813500

**ATTORNEY FOR CLASS**



**SIGNED this 16 day of August, 2005.**

FRANK R. MONROE
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| MICHAEL D. GEORGE | ) CASE NO. 04-11631-FM |
| DEBTOR | ) (Chapter 7) |
| | ) |
| RONALD E. INGALLS, TRUSTEE | ) |
| PLAINTIFF | ) |
| VS. | ) ADVERSARY NO. 05-1006-FM |
| | ) |
| MICHAEL D. GEORGE | ) |
| DEFENDANT | ) |

<u>MEMORANDUM OPINION</u>

The Court held a trial of the above entitled and numbered adversary proceeding on August 9, 2005. The issues tried were whether the Debtor should be denied a discharge under 11 U.S.C. §§ 727(a)(2),(3),(4)(A) and/or (5). It is, therefore, a core proceeding under 28 U.S.C. §157(b)(2). This Court has jurisdiction to enter a final order under 11 U.S.C. §1334(a) and (b), 28 U.S.C. §157(a) and (b)(1), 28 U.S.C. §151 and the Standing Order of Reference of all bankruptcy matters to this Court by the United States District Court for the Western District of Texas. This

1



EXHIBIT
1

Memorandum Opinion shall constitute findings of fact and conclusions of law under Bankruptcy Rule 7052.

## SETTING THE STAGE

Michael George, the Debtor herein, was the 100% shareholder and the person in total control of the business affairs of both CKG Energy, Inc. [pending in this Court under Case No. 04-11551-FM] and CKG Pipeline, L.L.C. [pending in this Court under Case No. 04-12339-FM]. Both CKG cases have been consolidated administratively under Case No. 04-11551-FM and will be referred to herein simply as CKG.

Plaintiff, Ronald E. Ingalls, Trustee, is the Chapter 11 Trustee for CKG.

George has for many years been a promoter in the oil and gas industry. His modus operandi has been to get individuals to invest in joint venture drilling programs he has promoted through various different corporate entities that he owned and controlled over at least the past fifteen years. His investors have not met with great success although Mr. George has been able to live quite well off of the investments people have made with him.

Examples of his lack of success are the following:

1. Judgment and Order of Severance (Exhibit P-35) entered in Cause No. 98-11-11118, styled *Ayers, et al v. George and Trump Energy, Inc.* and Cause No. 98-11-11118-A, styled *Rose Prestka, et al v. Michael George and Trump Energy, Inc.*, in the 135th Judicial District Court of Jackson County, Texas on May 17, 1999, which Judgment determined that the Defendants' [Michael George and Trump

2

Energy (a corporation owned and wholly controlled by Mr. George)] made certain misrepresentations and omissions of material fact in the sale of securities to the intervenors therein which "constitute actual fraud, ....". Judgment was entered against Mr. George and Trump Energy in the amount of $1,560,980.00.

2. Mr. George is the subject of cease and desist orders issued by various state securities agencies as follows:

A) August 15, 1990, Order of Prohibition, Wisconsin, docket No. X-90037(E).

B) January 5, 1991, Permanent Cease & Desist Order, Montana Securities Dept., Docket #8-16-90-23.

C) January 27, 1998, Cease & Desist Order, Pennsylvania Securities Commission, Administrative Proceeding Docket No. 9801-09.

Virtually all of the money spent by Mr. George in the operations of CKG was investor money. Less than 1% of all funds received by CKG came from actual production of producing wells. The securities sold by Mr. George through CKG were unregistered. The investors in CKG have not seen a return of even one penny on their investment. Mr. George is a prime example of why state governments have established securities regulation agencies.

None of the leasehold interests acquired by CKG were actually put into the name of the joint ventures into which investors invested.

All of the money invested by the investors was for the most part put into one account in the name of CKG.

Mr. George lived out of the operating account of CKG. He

3

neither took a salary nor accounted for expenses.  He simply had checks written to him or for his benefit pretty much on a daily basis as he solely directed.  He acted as if the money in the CKG accounts that came from CKG joint venture investors was his own.

Obviously, not all of the money received from the joint venture investors was used for joint venture purposes.  Therefore, CKG ran out of money before it could meet all of its drilling obligations under the various joint venture agreements.  CKG is in material default to all of its investors.

Mr. George is the proverbial hog feeding at the trough of investors' money without any real regard for the investors' rights. Mr. George is the ultimate smooth talker who should not be trusted with one single tiny nickel.

Mr. George was in an automobile accident on or about May 20, 2001.  As a result of the accident, he lost his sight.  Mr. George claims that his blindness is the primary cause of any deficiencies that occurred in the operation of CKG and/or in the filing of the schedules and statements of affairs and other documents in his own personal Chapter 7 bankruptcy case.

However, the evidence shows that Mr. George's conduct in living out of his various corporate bank accounts was exactly the same before he became blind as afterward.  Mr. George has a history of not having or using a personal bank account.  He has always handled his personal finances on two bases:  1) spending cash taken from the bank accounts of corporations he owned and controlled; and 2) directing whatever corporation he at any point in time controlled to write large checks for his benefit.  The evidence

4

reflects that in 2001, $235,000.00 of CKG investor money was spent by Mr. George for his own personal benefit.  In 2002, the number escalated to $773,000.00.  In 2003, hampered by the fact that investor money was running low, Mr. George was only able to spend $289,000.00 on his own personal affairs.

Exhibit P-4 contains all of the various checks written on CKG for Mr. George's benefit.  They include among other things ad valorem taxes on his personal home, payment to the Internal Revenue Service on personal taxes, payments on his personal MasterCard, purchase of a business originally called "Flowers by George" for his daughter Tracy George, payments to his daughter Courtney George, his father David George, his nephew Nick George, and his ex-wife Kellie George, all of whom were allegedly "employees" of CKG but whose primary functions were to serve as personal assistants to Mr. George because of his blindness (it should be noted that none of the payments to any of these people reflect any IRS or Social Security withholding), payment of personal cable bills and personal telephone bills, payment for substantial improvements to Mr. George's house, purchase of a four-wheeler, purchase of a Mercedes-Benz, payment of City of Austin personal utilities, payment of his ex-wife's credit cards, payment for groceries, payment of Hills of Lakeway membership monthly fees for his son's membership, payment of personal dry cleaning, purchase of boats and jet skis owned by Mr. George, payment of personal child support, payments to Bear Stearns for personal stock investments, payment of in excess of $150,000.00 to his parents' automobile company, payment of his parents' home mortgage payments, and on and

5

on and on.  The gory details and the specific amounts as to each category are found in Plaintiff's Exhibits 9A, 9B, 9C, 10A, 10B, 10C, 10D, 11, 12, 13, 14, 15, 15E, 18, 19, 20, 21, 22 and 23.

However, the egregiousness of the above outlined conduct of Mr. George has very little to do with the merits of the lawsuit tried.  The foregoing does, however, establish that CKG has a claim against Mr. George as that term is defined under 11 U.S.C. §101(5) and that the Plaintiff, therefore, has standing to pursue its complaint against Mr. George seeking denial of his discharge. Additionally, the actions of Mr. George as outlined above also serve to raise doubt as to Mr. George's credibility.

## FACTS SPECIFIC TO THE COMPLAINT

Mr. George, through CKG, purchased a business called "Flowers by George" with CKG investor funds and put it in his daughter's name.  Unfortunately, the record falls short of establishing that Mr. George actually has, or ever had, an ownership interest in this business.

Mr. George owns two jet skis which were not scheduled.

Mr. George has not filed tax returns for either of the years 2003 or 2004.  Further, he has produced virtually no personal records from which his schedules, or his testimony, can be verified or his true financial condition ascertained.  Mr. George claims all of his personal records were in the records of CKG turned over to Plaintiff as CKG's trustee.  The Trustee testifies, however, that the only records of Mr. George that he found were certain of his medical records.  That is clearly consistent with the fact that Mr. George never maintained any bank accounts and operated solely by

6

either paying cash [obtained from CKG] for everything or by having CKG (or prior corporations) write checks for whatever he wanted to pay for or acquire.

Part of the evidence is a financial statement dated May 31, 2002. It obviously contains inflated values in various respects. The Trustee says that the very existence of this financial statement shows a violation of Section 11 U.S.C 727(a)(5). However, no one asked Mr. George any material questions with regard to the financial statement. Neither the Trustee nor his own counsel. Therefore, it's hard to judge whether the Debtor has failed to explain a loss of assets by solely looking at the May 31, 2002 financial statement as his bankruptcy petition was filed almost 23 months later and no one asked him a single question about the assets listed thereon.

### CONCLUSIONS OF LAW

1.   **11 U.S.C. §727(a)(2)(A).**   The Trustee claims that "Mr. George, with the intent to hinder, delay, or defraud the creditors and/or an officer of the estate transferred, concealed, destroyed, mutilated or removed property of the Debtor or permitted same to occur within one (1) year of the Order for Relief." However, the First Amended Complaint is slim on details.  Clearly all of Mr. George's misdeeds with regard to the cash which CKG received from investors in its drilling programs have nothing to do with whether Mr. George has concealed property from his estate's trustee. Section 727 requires that the Trustee prove that Mr. George has fraudulently conveyed or secreted personal assets.  The only

7

evidence that this occurred is that George owns two jet skis that were not scheduled.

With regard to the business known as "Flowers by George", the evidence in the record shows that Mr. George used investors' money to buy this business for his daughter. There is no evidence that he owns it himself.

The allegations that Mr. George owns a Bar/Restaurant located in Costa Rica valued at $250,000.00 and perhaps another boat valued at $200,000.00 are simply not substantiated by any evidence in the record.

So, the question for the Court is whether Mr. George's failure to disclose on his schedules two jet skis, which his daughter testified he had owned for some time and that are currently in his garage, is a violation of 11 U.S.C. §727(a)(2)(A) which requires the denial of his discharge. These two jet skis were made by Yahama and were acquired by George from Woods Fun Center, Inc. in August 2002 for $7,600.00 and $6,882.00 respectively.

The record did not establish why a blind man needs two jet skis. However, they are clearly his. He had to know that they were his. He had owned them for less than 2 years when he filed his sworn schedules which makes no mention of them. They are in his garage. He did not schedule them. He has yet to amend his schedules to include them.

The burden of proof under 11 U.S.C. §727(a)(2) is on the party who brings the objection to discharge. Rule 4005, *Federal Rules of Bankruptcy Procedure*. Additionally, it is required that all

subsections of Section 727 be construed liberally in favor of the debtor and strictly against the creditor as part of the "fresh start" policy. *In re Adleman*, 541 F.2d 999, 1003 (2nd Cir. 1976). The objecting party must demonstrate under the statute that the debtor has either transferred, removed, concealed, destroyed or mutilated property of the debtor in the year immediately preceding the filing of the petition or property of the estate after the filing of the petition with the intent to hinder, delay or defraud a creditor. 11 U.S.C. §727(a)(2)(A) and (B). The preponderance of the evidence burden of proof applies. *Grogen v. Garner*, 498 U.S. 279 (1991). Once a prima facie case is established by the objecting party, the burden shifts to the debtor. *In re Hawley*, 51 F.3d 246, 249 (11th Cir. 1995).

In this case, George knew that he owned two jet skis that he had purchased for a total consideration of almost $15,000.00 only a short year and one-half before the petition date. He knew they were in his garage. He failed to disclose them on the schedules. Those facts, together with his general mode of operation as outlined in specific herein above and his lack of credibility, lead the Court to conclude that the Plaintiff has met his burden of establishing a prima facie case that George, with the intent to hinder, delay or defraud his creditors, concealed the existence of the two jet skis, which became property of the estate after the date of the filing of the petition initiating this case.

In fact, George never explained why these two items were left off his schedules. Further, he did not explain why his schedules

9

have not, to date, been amended to include them. George's testimony was simply silent on this point. Accordingly, George has failed to rebut the prima facie case established by the Plaintiff.

The only conclusion is that the Debtor has willfully, and with the intent to defraud his creditors, concealed this property of his bankruptcy estate.

2. 11 U.S.C. §727(a)(3). This one is even easier. The evidence reflects that George basically maintained no personal records and never has. As alleged in the First Amended Complaint, George testified at his Rule 2004 examination that he had no personal bank accounts and no recollection of the last time he had maintained a personal bank account and that all of his personal banking business was conducted through the various corporate entities that he had owned and operated over the years. George and all witnesses with knowledge admitted this was true. Since George has no personal records from which his transactions can be reconstructed or his true financial picture garnered or his testimony verified, his alleged defense that all of his personal financial records were turned over to the Plaintiff because they were part of the records of CKG rings very hollow.

Further, George has not completed and filed either his 2003 or 2004 Income Tax Return. Presumably, this is because he has no records from which it can be ascertained what his income, in fact, was for those years.

George's mode of operation, not only during the time of CKG but for years prior, establishes that he has never maintained

10

personal records.  Obviously, if one does not maintain personal records, one cannot have his personal financial affairs either traced or determined with any degree of accuracy.  His failure to keep and maintain the basic normal records is not excused by his blindness.  This is his mode of operation and has been so since long before his blindness occurred in 2001.

"In order to state a prima facie case under §727(a)(3), a creditor objecting to discharge must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions."  *The Cadle Company v. Terrell*, 2002 W.L. 22075 (N.D. Tex. Ft. Worth Div. 2002) citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3rd Cir. 1992).  Once these factors have been proven, the burden shifts to the debtor to prove that his failure to keep adequate records "was justified under the circumstances."  *In re Cox*, 41 F.3d 1294, 1297 (9th Cir. 1994).

The Debtor proffered only two justifications for not keeping normal records.  First, that's the way he'd always done business. That is no justification at all.  Second, his blindness.  However, his blindness was not the cause of George's failure to keep personal financial records.  He admitted he had always done business that way.  It is obviously a willful decision that he had made long ago.  After all, living out of corporations which he owned and controlled certainly makes it harder, if not impossible, to figure out where the money went and what it was spent for.  It

11